UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff(s),

  v.                                         Case No. 09-CR-292

JAMIE SOTO,

        Defendant.

**SENTENCING MEMORANDUM**

      Defendant Jamie Soto pled guilty to the crime of Assault with a Dangerous Weapon while in Indian Country, contrary to 18 U.S.C. §§ 113(a) and 1152. The maximum penalties for this offense are ten years in prison and a $250,000.00 fine. As part of the plea agreement, the Government moved to dismiss a separate charge for knowingly using and discharging a firearm in relation to a crime of violence, contrary to 18 U.S.C. § 924(c)(1)(A)(iii), which would have mandated a consecutive sentence of at least ten years. In return for dismissal of the § 924(c) count, the defense agreed to stipulate to a sentence of five years imprisonment. The United States Sentencing Guidelines ("U.S.S.G.") called for a sentence between 21 and 27 months. Upon consideration of the Presentence Investigation Report and the arguments of counsel, as well as the factors set forth in 18 U.S.C. § 3553, the Court sentenced Soto to one year and a day. This memorandum will set forth, in writing, the Court's reasons for doing so. *See United States v. Higdon*, 531 F3d 561, 565 (7th Cir. 2008) ("We suggest that when a judge decides to impose an out-of-guidelines sentence-whether it is above or below the guidelines range-he write out his

reasons rather than relying entirely on the transcript of his oral remarks to inform the reviewing court of his grounds. The discipline of committing one's thoughts to paper not only promotes thoughtful consideration but also creates a surer path of communication with the reviewing court.").

**I.**

The starting point to determine a proper sentence in federal court is to first calculate the advisory range under the U.S.S.G. The Court must then consider the factors set forth in 18 U.S.C. § 3553(a) to determine a fair and just sentence. In this case, the base offense level was 14, pursuant to U.S.S.G. § 2A 2.2(a). The offense level was increased by 5 levels because a firearm was discharged in the course of the offense, pursuant to U.S.S.G. §2A 2.2(b)(2)(A), resulting in an adjusted offense level of 19. After a 2 level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E 1.1(a) and an additional 1 level downward adjustment on motion of the Government pursuant to § 3E 1.1(b), the total offense level was 16. Soto had no previous criminal convictions and thus his total criminal history score was 0, placing him in criminal history category 1. The resulting guideline range based upon an offense severity score of 16 and a criminal history category 1 was between 21 and 27 months.

As a second step in arriving at an appropriate sentence, the Court must consider all of the factors set forth in § 3553(a), *United States v. Harris*, 490 F.3d, 589, 593 (7th Cir. 2007), cert denied, 552 U.S. 1122 (2008). Those factors include:

(1) The nature and circumstances of the offense and history and characteristic of the defendant;

(2) The need for the sentence imposed–

2

> (A) to reflect the seriousness of the offense to promote respect for the law and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner;

(3) The kinds of sentences available;

(4) The advisory guideline range;

(5) Any pertinent policy statements issued by the sentencing commission;

(6) The need to avoid unwarranted sentence disparities; and

(7) The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). After considering these factors, the Court must impose a sentence that is "sufficient but not greater than necessary" to accomplish the purposes of sentencing. *Id.*

## II.

**A. The Nature and Circumstances of the Offense**

The offense was an extremely serious one that fortunately did not result in any injury. In the early morning hours of November 1, 2009, Menominee Tribal Police proceeded to N654 Chief Little Crow Road in response to a 911 call regarding a shooting. Upon arrival, officers met with Jerilyn Soto, the defendant's wife, who was crying and appeared to be intoxicated. Ms. Soto reported that earlier in the night, she went out with her brother and two others, while a younger brother babysat her children. Upon their return home, the defendant confronted her, angry that she had been drinking and that he did not know her whereabouts. Stephen Teller, the brother with

3

whom she had gone out, stepped in, and a fight broke out on the front lawn. Teller apparently got the best of the defendant and had him in a headlock, choking him until the defendant signaled he couldn't breathe and was released. The defendant also received a black and swollen eye in the course of the fight.

When Teller released him, the defendant ran into the house to get his gun while the others got in the car and began driving away with Teller in the front passenger seat. As they were driving away, the defendant exited the front door of his house and fired a single shot at the car as it was driving away, striking it in the front passenger door. Police photos showed that the bullet passed through the door below the door handle and struck the post between the front passenger door and the rear passenger door. The gun, a Hi Point Firearms 9mm Luger pistol, was recovered at the house.

The defendant, who had left after the incident, was contacted by an officer and agreed to meet with him to tell his side. After initially claiming he had done nothing wrong and had acted in self-defense, the defendant invoked his right to counsel and was taken to jail.

**B. History and Characteristics of the Defendant**

The defendant is 31 years old and was born in Chicago, Illinois to a single mother. He has no criminal record, either as a juvenile or an adult. He reports he experienced a good childhood, being raised initially with his two siblings by his mother alone who worked multiple retail jobs in order to provide food and clothing for her children. He did not meet his biological father until he was seven years old and never had any relationship with him. When he was nine, his mother married Richard Martinez, who served as his father figure throughout his life and taught him to be responsible and hard working. The family maintained a lower middle class lifestyle and lived in

4

the same home throughout the defendant's childhood. Mr. Martinez died of cancer at age 50 in 2000. The defendant, who had developed a close relationship with his step-father drove him to his chemo-therapy treatments twice per week during the year before his death. The defendant also had, and has maintained, a close relationship with his mother.

Although gangs were prominent in his south side neighborhood and his older brother got involved in gang activity as a youth, the defendant managed to steer clear of gangs. According to his mother, the defendant focused on sports and school instead. His attendance at school suffered, however, when he became involved in a work program, and he ended up short of the credits needed to graduate after four years at Farragut Career Academy in Chicago. He entered the Joliet Job Corps voluntarily and earned his HSED. He also earned a certificate in building maintenance. He ultimately earned his high school diploma from Joliet Township High School on June 15, 1999.

The defendant met Jerilyn Crowe, a member of the Menominee Tribe, at Job Corps in 1998 and they married in Chicago in September of 2000. She encouraged the defendant to eventually move to Keshena and pursue a law enforcement career. Although the defendant and his wife describe each other in positive terms, Jerilyn Soto filed for divorce in Shawano County, Wisconsin in 2003. That petition was dismissed in 2005, but the couple was ultimately divorced in July of 2009 in the Menominee Tribal Court. Ms. Soto offers a confusing explanation that the divorce was not due to a falling out but to improve their chances of getting the financing to buy a home on the Reservation. She claims that she and the defendant have continued living together and never separated.

The defendant and Ms. Soto have three children, ages 8, 5, and 4, all of whom reside in the family home. Ms. Soto reports that the defendant spent a great deal of time with their children,

5

talking with them, instructing them on how to live a positive life and helping them with their homework. She states that since he has been in custody for the offense, the children have been having a difficult time and the household has been in chaos. The close relationship between the defendant and his family is confirmed in letters from other family members, including Stephen Teller, who describes the defendant as a father he respects and appreciates for all he does for his children. Teller, who describes the defendant as "a true brother" to him, requests that leniency be shown the defendant because "he's a good man, husband, and father."

Prior to his arrest, the defendant had a solid history of employment. He worked for six years in Chicago as a security guard for a downtown high rise. He left that job when the family moved to Keshena and took a job as a security guard at the Menominee Indian Casino. He then became a correctional officer in the Tribal jail. At the time of the offense he was a security officer for the Menominee Tribal Housing Authority. The defendant had also completed four semesters in Criminal Justice at the College of Menominee Nation in Keshena in the hope of becoming a law enforcement officer. As a result of his arrest and conviction, the defendant lost his job as a security officer for the Tribal Housing Authority, and has abandoned his hope of becoming a law enforcement officer.

Since his incarceration following his arrest on November 1, the defendant has sought treatment for anxiety and depression. He reports he is sad because he is away from his wife and children and unable to spend time with them. He feels horrible because his children are suffering from his mistake and he is unable to be an active participant in their lives. His wife visits him in the jail weekly, and they have discussed plans to move away from the Reservation because of the bad influence it has had on them, including the culture of heavy drinking.

6

Case 1:09-cr-00292-WCG   Filed 04/30/10   Page 6 of 13   Document 31

Finally, the defendant gave a moving allocution, expressing sincere remorse for his conduct and the effect it was having on his wife and children. He said he regretted his action not only because of the risk it posed to those in the car but because it deprived his children of the guidance and assistance he was able to provide.

**C. Sentencing Purposes**

Taking into consideration the nature and circumstances of the offense and the history and characteristics of the defendant, the Court must fashion a sentence that meets the various purposes of a sentence as set forth in § 3553(a). In addressing the specific purposes in the context of the particular case before it, the court first considers the arguments of counsel. In this case, the parties made a joint recommendation that the Court impose a sentence of five years. Normally, the Court gives significant deference to joint recommendations of both the prosecution and the defense, although it must still undertake its own analysis and arrive at its own determination as to the proper sentence. In this case, however, the Court noted that the joint recommendation was probably not "joint" in the true sense of the word. The minimum ten-year consecutive sentence that was mandated by § 924(c) gave the defense little choice but to agree to the Government's insistence that it recommend five years. Given the leverage that the §924(c) charge afforded the Government, the Court concluded that the defense recommendation was not a concession that consideration of the § 3553 factors warranted a sentence of that amount. In essence, the prosecution had decided that a five-year sentence was called for and the defense had to agree in order to avoid the at least ten-year sentence that otherwise would have been mandated if the § 924(c) charge had not been dismissed. Under these circumstances, to simply adopt the joint recommendation of the parties because it was a joint recommendation would have shifted the responsibility for sentencing to the prosecution.

Though easier from the Court's standpoint, allowing the prosecution alone, or even together with the defense, to determine the sentence where discretion is expressly granted the Court is not consistent with the current federal sentencing law. Accordingly, the Court was required to perform its own sentencing analysis.

The Government's request for a sentence of five years was based in part upon the penalty structure of § 924(c). Having relieved the defendant of a mandatory minimum ten-year sentence, a recommendation of five years no doubt seemed reasonable. The Court concluded, however, that the actual guideline range for the offense of conviction was a more appropriate starting point for the sentencing determination. The Sentencing Guidelines represent a systematic effort to take into consideration the various facts and circumstances concerning the offense and the offender in order to arrive at a range within which a reasonable and just sentence would fall. Here, the Guidelines factored in both the fact that a firearm was involved and that it was discharged. U.S.S.G. §2A2.2(b)(2). The Guideline range also took into consideration the fact that the defendant had no prior criminal record, and that he had accepted responsibility for his offense and entered a plea of guilty. Accordingly, the Court began its analysis with the Guideline range of 21 to 27 months in mind.

The strongest factor in favor of a sentence within or above the Guideline range, and no doubt the factor given primary consideration by the Government, was the seriousness of the offense. To be sure, the offense was extremely serious. Although no one was hurt, this was completely fortuitous given the substantial risk of serious injury or even death that the defendant's conduct created. Having shot a firearm into a moving car occupied by four or five people, the defendant could easily have seriously injured or even killed someone. That he did not was attributable more

8

to luck than any conduct on his part. Yet, the fact that no one was harmed was, in the Court's view, an important factor to consider, though one also factored into the Guideline range.

The Court also found significant the fact that the offense seemed entirely out of character for the defendant. The defendant had no history of assaultive conduct, although he had previously been in a fight with Teller several years earlier, which he also lost. On that occasion, Teller had hit him in the face while holding a pair of brass knuckles causing facial injuries for which he received medical treatment in September of 2005. On the occasion giving rise to the instant offense, it appears that when the defendant confronted his wife in anger over the fact that she was out late drinking and he couldn't reach her, Teller stepped in and again beat him up. The defendant apparently felt humiliated and, instead of walking away, he acted out of rage. He went and retrieved his gun from the house and fired at the car as it was leaving with Teller and the others inside. Though humiliation is not a defense and the behavior was entirely unjustified, these circumstances suggest that the offense was the product of a unique set of circumstances and not part of a pattern of conduct.

The fact that the defendant had no prior criminal record and a history of steady employment also suggests that this offense was out of character for him. Of course, the fact that the defendant had no prior record is considered under the Guidelines, but what the Guidelines do not consider is the obstacles the defendant overcame in steering clear of criminal conduct, avoiding alcohol and drug problems, finishing school, and maintaining steady employment. While there are no doubt many individuals who start life being raised by a single mother and grow up on the south side of Chicago surrounded by gangs that are law abiding and hardworking, it is more difficult for them to do so than for many who grow up under more favorable circumstances. The record here suggests

9

that the defendant worked hard to become a productive member of society, and to support his family.

Finally, it is also noteworthy that the defendant has a strong devotion to his family. Notwithstanding the somewhat implausible explanation for their divorce, the family remained intact and the defendant was living with and providing support for his wife and children up until the time of his arrest. The defendant's strong commitment to his three young children and his desire to provide them the support and guidance that he saw so lacking for those around him as he grew up were clear from the pre-sentence report, the letters of support, and the defendant's allocution. Indeed, it is the loss of daily contact with his family resulting from his incarceration since his arrest that is creating significant problems for both the defendant and his family.

Based upon these considerations, the Court concluded that a sentence of one year and a day, followed by three years of supervised release, was sufficient but not greater than necessary to accomplish the purposes for a fair and just sentence. Though nine months less than the low end of the applicable Guideline range, the Court concluded that the defendant's positive characteristics described above warranted a below-guideline sentence. The fact that at 31 years of age the defendant had no prior criminal record, no history of a drug or alcohol problem, and had maintained a steady employment record, together with the unique set of circumstances that gave rise to the offense, suggested that the defendant did not represent a substantial threat to the safety of the public. Having lived a crime-free productive life up to this point, a lengthy sentence did not appear necessary to protect the public. In addition, a three-year term of supervised release would insure that the defendant would be monitored upon his release to insure that he returned to the positive lifestyle he had been living.

10

These facts also indicated that a lengthy term of imprisonment was not needed to provide the defendant with needed educational or vocational training, or other correctional treatment. Other than this brief moment when the defendant acted out of an irrational rage, he had been living a law-abiding life. Thus, he appeared to have no treatment needs. To the extent any treatment would be in order, there was no reason to believe it could not be effectively provided in the community while on supervised release.

With respect to the need for deterrence, the Court concluded that the need for specific deterrence was low because the offense itself was so out of character for the defendant. To the extent specific deterrence might be required, however, it was clear that the defendant had already suffered a significant loss and that a sentence of one year in prison, on top of the indirect consequences of his conviction, would serve as a strong deterrent. As a result of his arrest and conviction, the defendant lost his employment and was forced to abandon his goal of becoming a law enforcement officer. Being away from his family even for the six months prior to sentencing, given the close relationship he had enjoyed, was also proving more difficult for the defendant, who had never spent a day in jail, than for most offenders. He had sought mental health counseling and was prescribed medication.

The most difficult consideration for the Court was the need for the sentence imposed to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). In addition, the Court was reluctant to send too weak a message about the seriousness of the offense and undermine the goal of general deterrence. Despite the indirect consequences the defendant has suffered, the amount of prison time an individual is given as a sentence is the accepted measure of the punishment received and, thus,

11

the seriousness of the offense. By imposing a sentence of one year, the Court was concerned that it might be depreciating the seriousness of the offense.

Against these more abstract but no less real goals, however, the Court balanced the need to fashion a sentence that would build on the significant number of positive factors in the defendant's life and avoid taking action that would make it more difficult for the defendant to return to the success that he had previously worked hard to attain. The Court also considered the effect of a lengthier term of incarceration upon the defendant's family, especially his children. Taking these various factors into consideration, the Court concluded that a more lenient sentence than would otherwise be warranted was more likely to insure that the defendant would not re-offend in this case and therefore provide, in the long run, greater protection for the public.

The defendant enjoyed a close relationship with his family and significantly contributed to its well-being. The defendant took great pride in this fact, and it appears to have provided a significant motivation for his previous success in life. A shorter sentence would allow the defendant to return to his family sooner so as to minimize the disruption and reduce the possibility of permanent separation. The loss of this close relationship would, in the Court's view, make it more likely that the defendant would lose hope and perhaps even despair in returning to his previous success. A more lenient sentence also sends a strong message to the defendant and the community that his previous efforts to provide for his family and serve as a positive role model are worthy of recognition and have earned him a chance to show that a crime that resulted from a momentary but egregious lapse of judgment (but importantly caused no injury) need not result in the complete loss of everything the defendant had spent his life trying to accomplish.

12

Accordingly, for the reasons set forth above and on the record at the sentencing hearing, the defendant was sentenced to a year and a day in the custody of the Bureau of Prisons, to be followed by three years of supervised release, subject to the conditions set forth on the record.

Dated this __30th__ day of April, 2010.

s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge